**SIGNED this 11th day of December, 2019**

_Marcia P. Parsons_
Marcia Phillips Parsons
**CHIEF UNITED STATES BANKRUPTCY JUDGE**

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF TENNESSEE

In re

|  |  |
|---|---|
| GREGORY MITCHELL LAYMAN<br>and DONNA KAY LAYMAN,<br><br>            Debtors. | No. 19-50405 MPP<br>Chapter 11 |

## M E M O R A N D U M

Appearances:

|  |  |
|---|---|
| Maurice K. Guinn, Esq.<br>Post Office Box 1990<br>Knoxville, Tennessee 37901<br>_Attorney for Tennessee State Bank_ | Mark Dessauer, Esq.<br>Post Office Box 3740<br>Kingsport, Tennessee 37664<br>_Attorney for Gregory and Donna Layman_ |

**Marcia Phillips Parsons, Chief United States Bankruptcy Judge**.  This chapter 11 case, the debtors' second, is before the court on a motion to dismiss case or, alternatively, for relief from the automatic stay filed by Tennessee State Bank ("TSB"), the debtors' largest secured creditor.   TSB contends the debtors filed their current case in bad faith in order to prevent TSB

from enforcing its liens after the debtors defaulted under the terms of their confirmed plan in their first chapter 11 case that is still pending.   The debtors deny the bad faith allegation, maintaining that their defaults in their first chapter 11 case were due to an unforeseeable and extraordinary event, a barn fire that resulted in an uninsured loss of over two million dollars.   The debtors assert that the filing of their second case was necessary to prevent TSB's foreclosure so that they could preserve their assets and pay their creditors in full.   A hearing on TSB's motion was held on October 2 and 3, 2019.   Testifying at the hearing were the debtor Greg Layman and two officers from TSB, Shelly Spurgeon and Lee Lewis.   For the reasons discussed below, the case will be dismissed, the court having concluded that the debtors may not maintain two simultaneous reorganization cases and that their current case was filed in bad faith. This is a core proceeding. *See* 28 U.S.C. § 157(b)(2)(A).

## I.

The debtors are family farmers residing with their two children in Sevierville, Tennessee and currently farming 1,400 acres of corn, soybeans, wheat, and hay on land they own or lease in Sevier, Cocke, and Knox counties.   Additionally, the debtors own and manage several rental properties, including a mobile home park in Jefferson County, a condominium complex with five units in Sevierville, and three rental houses.   They also own a partially developed 57-acre Knox County subdivision known as River Island and at least one other parcel of undeveloped real property.   The debtors' borrowing relationship with TSB goes back to at least 2001.

The debtors filed their first chapter 11 case on February 28, 2014, No. 14-50274 MPP.   In their disclosure statement the court approved in that case, the debtors described numerous setbacks they had encountered, including a net loss of half a million dollars in 2007 from a weather-related loss of 700 acres of corn, the 2008 recession that had limited the marketability of three subdivision developments, and uninsured crop losses in 2012 and 2013 that had resulted in a net operating loss the latter year.   The debtors' schedules in that case listed unsecured claims of approximately $1.2 million, including almost $100,000 in past due property taxes, and secured claims of roughly $4.5 million owed to six creditors.   These included National Bank of Tennessee, the federal government's Farm Service Agency, and TSB, by far the debtors' largest creditor, with ten claims

totaling about $3.2 million secured by ten different real properties, including three owned by Mr. Layman's parents.   Farm Service Agency and National Bank of Tennessee were scheduled as owed around $850,000 and $260,000, respectively, although National Bank of Tennessee later filed a claim in excess of $800,000.

The debtors checked "disputed" as to each of the ten secured claims they scheduled for TSB, a harbinger of the contentious nature of debtors' first reorganization case which was fiercely opposed by both TSB and National Bank of Tennessee.   As TSB bank officer Shelly Spurgeon testified at the hearing, there were multiple disputes between the debtors and TSB in the first case. The contests included the debtors' request to surcharge TSB's collateral; TSB's motion that an agreed order permitting the debtors' use of TSB's cash collateral be terminated and the debtors be compelled to replace cash collateral used in violation of the order; TSB's motion for sanctions against the debtors based on their failure to comply with the order terminating the agreed order for use of cash collateral and requiring the debtors to replace the misused collateral; TSB's motion that the case be converted to chapter 7 or dismissed, relief that was also sought by National Bank of Tennessee; and even a renewed motion to dismiss or convert, after the debtors failed to comply with the court's order giving them the opportunity to cure the deficiencies that were the basis of the original motion.   TSB and National Bank of Tennessee also objected to the debtors' numerous proposed disclosure statements and plans until the parties ultimately settled upon certain plan terms and tendered an agreed order confirming the debtors' fourth amended plan which the court entered on February 26, 2016.

The confirmed plan provided for payment in full of all allowed claims over time except for administrative expenses in the form of debtors' attorney fees and United States trustee fees that were to be paid within 30 days after confirmation or as agreed.   Priority tax claims would be paid in full over 60 months with statutory interest of 12% and unsecured claims would be paid in full in monthly payments over 60 months.   Secured claims generally were to retain their liens and be paid in full with interest over five to 20 years with periodic payments.   The debtors would maintain required full coverage insurance on all improved real property or personal property collateral during the term of repayment, pay taxes when due, and continue to provide required financial reports and copies of their tax returns.   No defaults could accrue until after written notice

3

and a ten-day cure period, with the exception of defaults as to TSB and National Bank of Tennessee for which the debtors were provided a fifteen-day cure period.

The specific treatment for the claims of TSB under the confirmed plan included the surrender of certain collateral and initial payments to TSB upon confirmation totaling $101,336.51. The remaining balances on TSB's claims were to be amortized over 15 years at five percent interest and paid in semi-annual installments totaling $69,124.47 on January and July 31 of each year with the exception of the claim secured by the debtors' mobile home park which was to be paid in monthly payments of $2,167.79. All claims would be paid in full by a balloon payment on January 31, 2021. The confirmed plan also addressed two irrevocable standby letters of credit totaling $350,000 issued by TSB that, as stated in the letters, could be drawn upon by the beneficiary Knox County, Tennessee upon the failure of the debtors to perform under the "roads and hydrology" specifications of Knox County on the River Island subdivision. If funded during the plan, the resulting debt would similarly be paid in semi-annual installments, amortized over 15 years with five percent interest and a five-year balloon; otherwise, the letters would be released or replaced by January 31, 2021.

The confirmed plan additionally provided that upon confirmation TSB's collateral would vest in the debtors subject to the bank's liens, that the debtors would cooperate with TSB in signing flood certifications and any document modifications required as a result of the plan, and that TSB was entitled to all remedies upon default with the automatic stay being "expressly lifted post confirmation . . . to pursue defaults." Significantly, under the "Default" provision particular to the claims of TSB, the confirmed plan stated:

> The Debtors shall remain in Chapter 11 during the five-year term of the repayment to TSB subject only to any Order to "administratively close" the case which Order shall not terminate the Chapter 11 proceeding.

Accommodating this provision, the debtors were also precluded under the general provisions of the confirmed plan from filing an application for entry of a final decree "[n]o sooner than completion of the first five years on or after January 31, 2021." And consistent with 11 U.S.C. § 1141(d)(5), the debtors would not be granted a discharge until completion of all plan payments.

4

As permitted under the confirmed plan, the debtors did move to administratively close their chapter 11 case on September 21, 2016, in accordance with E.D. Tenn. LBR 3022-1 that permits such a closure "without entry of a final decree."   An order was entered granting the debtors' unopposed motion on October 11, 2016.   The order recited that "[a]s set forth in 11 U.S.C. § 1141(a), the provisions of the Confirmed Plan and Confirmation Order shall continue to bind" the parties, and that the case could be reopened by any party "to enforce the provisions of this Order or the Bankruptcy Code, including but not limited to, the filing of a Motion to Dismiss or Convert the case for failure to comply with the provisions of this Order, the Confirmed Fourth Plan of Reorganization, or any other applicable provision of the Bankruptcy Code."

Almost immediately after the plan was confirmed on February 26, 2016, the debtors' defaults as to TSB began, with notices of default followed by cures or force-placed insurance becoming the pattern.   The first notice of default was sent on April 7, 2016, based on the failure of Mr. Layman's parents to sign modifications to deeds of trust necessary to extend their terms during the life of the plan.   The notice described the difficulties in getting Mr. Layman to execute a flood certificate and the debtors themselves to sign the modifications to the deeds of trust, even though TSB had revised the documents in accordance with Mr. Layman's request.   As stated in the notice, during a visit by Mr. Layman to a TSB branch on March 25, 2016, he had refused to sign one of the flood certificates, failed to sign any deed of trust modification, and delivered the next monthly plan payment due but instructed a TSB employee not to cash the check as there were no funds to cover it.   Although after the visit the debtors signed the required documents and advised TSB that it could cash their check, TSB was only able to obtain the required signatures of Mr. Layman's parents after TSB through counsel issued the formal notice of default.

On May 18, 2016, TSB issued the next notice of default after receiving notice that the insurance coverage on three properties constituting its collateral was being canceled due to the debtors' failure to pay the premiums, leading TSB to force-place insurance on the properties to protect its interests.   On October 5, 2016, TSB sent a notice of default for the debtors' failure to provide copies of their 2015 federal tax return despite several email and telephonic requests to Mr. Layman.   Then on December 8, 2016, TSB received and then forwarded to the debtors for response a notice of pending insurance cancellation that it had received on two other properties.

5

On March 8, 2017, TSB formally informed the debtors that Knox County had called the two letters of credit in a January 31, 2017 demand letter, as the debtors had been advised in a February 6, 2017 email, and that the debtors were therefore required by the terms of the confirmed plan to comply with its repayment schedule, which according to the evidence added $16,794.22 to the semi-annual payments that the debtors were already required to make to TSB.   Attached to the demand letter was a copy of a Notice of Nonconformance that Knox County had issued to Mr. Layman the prior August, informing him of certain safety and drainage concerns, along with needed road repairs regarding the River Island subdivision, and advising that unless the work was completed within 30 days Knox County would call the letters of credit.

On April 27, 2017, Ms. Spurgeon on behalf of TSB emailed the debtors concerning their failure to respond to the bank's multiple requests for a 2016 year-end balance sheet, income/expense statement, and personal financial statement, and asking when the bank could expect to receive a copy of the debtors' 2016 federal tax return.   Ms. Spurgeon also asked when the debtors would be making their April monthly payment that was past-due.   On May 31, 2017, Ms. Spurgeon again emailed the debtors to request the same financial documents that still had not been provided, although the debtors had apparently made their April payment.   However, at this point, the May payment was past due as Ms. Spurgeon also asked when TSB could expect to receive the payment.

Unbeknownst to TSB, the debtors had sustained a significant loss on May 11, 2017, when a fire occurred at one of their barns.   According to Mr. Layman's testimony, in the days prior to the fire a wind storm had damaged the barn's roof, with the debtors thereafter engaging a contractor to repair the damage.   While doing the repair work one of the contractor's employees allegedly dropped a cigarette into the hay stored in the barn, igniting a fire that burned the barn to the ground and destroying the debtors' equipment, seed, chemicals, and fertilizer stored in the barn at a total loss of over two million dollars according to Mr. Layman.   The debtors had no insurance coverage on the barn or its contents.   Mr. Layman testified that the contractor had assured him before being hired to do the work that he was insured and had even provided a certificate of liability and workers compensation insurance.   After the fire, however, the contractor's insurance company denied the claim because the insurance had expired due to nonpayment.   TSB would not learn of the fire loss

6

until January 2019.

By letter dated June 16, 2017, TSB advised the debtors that it had received notice from an insurance company stating that TSB was being removed as a lienholder/mortgagee on the policy because "[t]he Insured has informed us that your mortgage/lien has been satisfied."   As the lien had not been satisfied, TSB demanded that the debtors provide evidence that the bank had been immediately placed back on the policy as lienholder/mortgagee.   That letter was followed by another one from TSB to the debtors on June 20, 2017, which letter recited that TSB had received a notice of removal as lienholder/mortgagee on yet another policy based on erroneous information that the lien had been satisfied.   The letter further advised that three other insurance policies covering the bank's collateral had expired on June 19, 2017, and that the bank was force-placing insurance on the properties to protect its interests.   TSB acknowledged in the letter that it had received on June 14, 2017, a copy of the debtors' 2016 federal tax return extension and a personal financial statement signed by Mr. Layman, but stated it still had not received the 2016 year-end balance sheet and income/expense statement and a signed personal financial statement from Mrs. Layman as first requested on March 16, 2017.   On December 8, 2017, TSB notified the debtors by letter that it was force-placing insurance on yet another property after the debtors failed to provide evidence of a new policy upon receiving notice of nonrenewal of the existing policy.   By letter dated February 2, 2018, TSB advised the debtors of another notice of cancellation of insurance for non-payment of the premium.

On February 7, 2018, Mr. Layman emailed Ms. Spurgeon requesting a per acre price at which TSB would grant a partial release on the River Island subdivision property.   Ms. Spurgeon responded the next day with an email stating that prior to answering this question TSB wanted to know when the debtors would be submitting their past-due January 31, 2018 payment of $85,918.69, for which TSB subsequently sent a formal notice of default dated February 14, 2018. Two days later, on February 16, Mr. Layman began an email exchange with Ms. Spurgeon asking to meet her that day at TSB's Sevierville branch "to discuss the payoff on my note."   Ms. Spurgeon responded by asking if he intended "to payoff ALL of the Notes," to which Mr. Layman replied "that's what we're going to discuss[,] what time will you be available to meet?"   When Ms. Spurgeon failed to respond within ten minutes, Mr. Layman emailed her a series of three

question marks.   After an hour had passed Mr. Layman emailed again, saying, "Miss Spurgeon it has been an hour and I'm still awaiting your response."   Ms. Spurgeon, who was located in a branch office other than the Sevierville office, responded three minutes later, "I have been in a meeting and have another at 3:00; any discussion could be by telephone. Would you like for me to call you at 4:00?"   Mr. Layman responded, "No I would prefer to meet in person Shelly," no longer addressing her as "Miss Spurgeon."   When she responded that "I am not available to meet in person," Mr. Layman asked, "You're not available to meet in person today or you're not available to meet me in person[,] I'm confused."   Ms. Spurgeon responded, "I am not going to meet you in person, do you want me to call you at 4:00?"   Mr. Layman answered, "Hahaha." Confused by the response, Ms. Spurgeon telephoned Mr. Layman at 4:00 p.m. and recorded the conversation.   While the audio recording of the conversation was not introduced, there was no dispute as to what was said.   As Ms. Spurgeon testified, Mr. Layman advised her that he had secured the financing to pay off TSB (there was no evidence that he had done so) and asked if the bank was going to reduce the balance owed to it.   When Ms. Spurgeon responded that TSB would not, Mr. Layman replied that if the bank wasn't going to work with him, he had no incentive to pay off the bank before the end of the five-year plan.   Ms. Spurgeon then clarified with Mr. Layman that he was going to at least catch up the defaults, and proceeded to close the conversation by saying, "if there's anything you need, Mr. Layman, please let me know."   Mr. Layman responded, "Oh don't worry.   I'll see you out one day and we'll have a nice pleasant little conversation."   Perceiving the last comment as a threat, Ms. Spurgeon filed a police report and an incident report with the bank's risk management department.   TSB decided to have a male employee, Lee Lewis, correspond thereafter with Mr. Layman, and Ms. Spurgeon advised the debtors by letter dated February 20, 2018, that all further communications with the bank must be with Mr. Lewis and they were not to contact her for any reason.

On May 30, 2018, Mr. Lewis emailed the debtors for what he termed the then-third request from TSB for the debtors' 2017 income tax return or request for extension, 2017 year-end income/expense statement, and updated personal financial statements.   By letter dated August 21, 2018, TSB issued a notice of default for the debtors' failure to make the July 31 semi-annual payment and the July monthly payment which together totaled $93,330.51.   Days later, Mr.

Layman notified TSB that he was seeking a loan from Mountain Commerce Bank to pay off TSB. TSB asked for a copy of the commitment letter and Mr. Layman advised on the last day of the fifteen-day cure period that one would be forthcoming the next week, leading TSB to extend the cure period by five days to September 12, 2018.   When that date passed without payment or a commitment letter having been provided, TSB formally notified the debtors on September 14, 2018, that due to the uncured default the bank was accelerating the debts owed to it and demanded that the loan obligations be paid in full immediately.   TSB further advised that it would begin assessing that day the post-maturity interest rate of 24% on all the loan balances, except one for which the rate would be 18%.

On October 23, 2018, the United States on behalf of its Farm Service Agency moved to reopen the debtors' chapter 11 case in order to file a motion to dismiss or convert because of the debtors' failure to make payments due it under the plan.   The motion stated that the debtors had been late making their first annual plan payments of $11,600 and $40,048 due on July 1 and July 15, 2016, respectively, to Farm Service Agency and that the 2017 and 2018 annual payments had not been made.   A month later the United States withdrew its motion, reporting that the debtors had made their 2017 payments and that an agreement had been reached for the debtors to make their 2018 payments by February 20, 2019.

On October 12, 2018, Mountain Commerce Bank issued the debtors a loan commitment letter that was subject to the debtors obtaining a 90% loan guaranty from Farm Service Agency. The debtors pursued the guaranty, and TSB delayed any further default remedies until January 8, 2019, when TSB's counsel emailed debtors' counsel that due to the debtors' lack of progress in obtaining the guaranty, their failure to make any payment to the bank since the loans were accelerated, and their two-year delinquency in payment of property taxes totaling $34,389.10, TSB would be moving forward with issuing foreclosure notices.   Mr. Layman responded that he had not been able to obtain a response to his application from Farm Service Agency due to the government shutdown which had begun shortly before Christmas.

Eventually the debtors learned that Farm Service Agency had denied their application which denial in turn prevented the debtors from obtaining the loan from Mountain Commerce

Bank.   On January 31, 2019, Mr. Layman and his attorney met with representatives of TSB and its counsel offering to surrender two real properties at specified values to prevent foreclosure.   At this meeting, Mr. Layman disclosed to TSB for the first time the May 2017 barn fire and the fact that he had not had insurance on the equipment and other items lost in the fire.   When the parties were unable to reach an agreement and TSB advised that it was going forward with foreclosure, the debtors filed their second chapter 11 case on March 6, 2019, one day before the scheduled foreclosure.

On May 31, 2019, TSB filed the pending motion to dismiss or, alternatively, for relief from the automatic stay.   In the motion, TSB observes that many of the debtors' debts in this case are the same as in their first case, with TSB and Farm Service Agency being the largest creditors in each case, and that the debtors have yet to receive a discharge in the first case that is still pending. TSB notes that the debtors had defaulted under the terms of their confirmed plan, particularly as to TSB and Farm Service Agency, and that rather than seek to modify the plan under 11 U.S.C. § 1127(e), the debtors filed a second case so that they could be protected by the automatic stay which had been expressly lifted in the first case to permit TSB to pursue defaults.   According to TSB, the debtors' new filing was not in good faith and was a "backdoor" attempt to circumvent the requirements for a plan modification under § 1127(e) and the binding effect of confirmation under 11 U.S.C. § 1141(a).

In response to the motion, the debtors deny that they filed their second chapter 11 case in bad faith, noting that it is not atypical to file bankruptcy to prevent a foreclosure, and assert to the contrary that they are in fact acting in good faith because they have ongoing farm operations, at least one full-time employee and a reasonable possibility of reorganizing.   They maintain that they are not seeking to circumvent the terms of the confirmed plan, but only a chance to further reorganize as their default in their prior case was caused by the unforeseen circumstance of the barn fire.   The debtors further maintain that the creditors in their current case are different from the creditors in their first case and add that TSB is protected from any delay because it is oversecured.   According to the debtors, if their case is dismissed and TSB is permitted to foreclose, the substantial equity in their properties would not be realized for the benefit of unsecured creditors.   For purposes of this hearing only, TSB stipulated to the collective value

10

assigned by the debtors to the real properties securing TBS's claims, a value of $2,229,000 for the properties owned by the debtors and a value of $1,650,000 for the three properties owned by Mr. Layman's parents.

On September 25, 2019, a week prior to the hearing on TSB's motion, the debtors filed a proposed disclosure statement and plan of reorganization that, as in their first case, proposes to pay all creditors in full.   The new plan, however, proposes to treat TSB's claims now totaling $2,093,453.96 differently than in the confirmed plan.   In their new plan, the debtors intend to surrender to TBS their residence and 20 acres for a credit of $900,000 and the 57-acre River Island subdivision for a credit of $750,000, thereby reducing the total indebtedness to TBS to $443,453.96.   The debtors propose to amortize this balance over 15 years at an interest rate of four percent, with semi-annual payments of $39,884.73 each July 1 and February 1 until July 1, 2024, when the remaining balance will be due.   As to Farm Service Agency's claims totaling approximately $780,000, secured by the debtors' equipment and personal property utilized in the farm operations and a second lien on certain real properties, the debtors propose to amortize and pay the debt over 20 years at a two percent interest rate with annual payments of $37,688.43 and $11,508.40.   With respect to unsecured creditors, the debtors propose to pay all claims in full in annual installments of $69,154.45 over five years.   All creditors are impaired under the plan.

## II.

Section 1112 of the Bankruptcy Code governs the conversion or dismissal of chapter 11 cases.   Under subdivision (b)(1), a court may dismiss a case "for cause" upon request of a party in interest.   11 U.S.C. § 1112(b)(1).   It has long been established in this circuit "that a debtor's Chapter 11 petition may be dismissed if it was filed in bad faith."   *Trident Assocs. Ltd. P'ship v. Metro. Life Ins. Co. (In re Trident Assocs. Ltd. P'ship)*, 52 F.3d 127, 130 (6th Cir. 1995); *see also In re Lee*, 467 B.R. 906, 917 (B.A.P. 6th Cir. 2012) ("Although a debtor's bad faith is not included in the non-exhaustive list [of 'cause' under] § 1112(b)(4), it is well settled in the Sixth Circuit that a debtor's bad faith in filing a chapter 11 may serve as cause for dismissal under § 1112(b)(1).").   "No single test exists for determining whether a bankruptcy petition was filed in good faith. Instead, it is a fact-specific and flexible determination that must be made on a case-by-case basis

by looking to a totality of the circumstances." *In re Lee*, 467 B.R. at 917 (quotations and citations omitted). Serial or simultaneous filings may indicate bad faith. *See, e.g., In re Mitan*, 168 B.R. 326, 330 (Bankr. E.D. Mich. 1994). "Where a debtor requests Chapter 11 relief for a second time, the good faith inquiry must focus on whether the second petition was filed to contradict the initial bankruptcy proceedings." *Elmwood Dev. Co. v. Gen. Elec. Pension Trust (In re Elmwood Dev. Co.)*, 964 F.2d 508, 511 (5th Cir. 1992).

III.

As noted by the debtors, courts have recognized that serial chapter 11 cases are not per se impermissible. *See In re Elmwood Dev. Co*., 964 F.2d at 511 (citing the Supreme Court's *Johnson v. Home State Bank* holding that serial chapter 7 and chapter 13 petitions are not categorically prohibited and that the good faith requirement provides adequate protection from abusive filings); *In re Jartran, Inc.*, 886 F.2d 859, 869–70 (7th Cir. 1989) (permitting new chapter 11 liquidating case after failure of reorganization plan in prior chapter 11). According to the debtors, courts have generally held that a second plan may modify the first plan where there are extraordinary, unforeseeable circumstances that caused the debtor's default or substantially impaired his performance under the prior plan, citing *In re Tillotson*, 266 B.R. 565, 569 (Bankr. W.D.N.Y. 2001); *In re Adams*, 218 B.R. 597 (Bankr. D. Kan. 1998); *In re Northtown Realty Co.*, 215 B.R. 906, 911 (Bankr. E.D.N.Y. 1998); *Matter of Buoy, Hall & Howard and Assocs.*, 208 B.R. 737, 743 (Bankr. S.D. Ga. 1995); and *In re Casa Loma Assocs.*, 122 B.R. 814, 818 (Bankr. N.D. Ga. 1991).

While the debtors correctly state the holding for these cases, there are two significant differences between them and the debtors' current case. First, these cases involved serial filings rather than two simultaneously pending cases like those of the debtors here. In the cited cases, the first chapter 11 was a completed reorganization, with original debts being discharged and new debts created by the plan being substituted. The plan was substantially consummated and the case closed before the filing of the second one. That was true even for the two individual cases cited by the debtors, *Tillotson* and *Adams*, which were filed prior to the changes brought about by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"). Those

12

changes made individual chapter 11 cases more akin to chapter 13 than to corporate chapter 11 cases, including the provision that an individual chapter 11 debtor does not receive a discharge until completion of plan payments rather than upon confirmation. *See In re Ball*, No. 06-1002, 2008 WL 2223865, at *3 (Bankr. N.D. W. Va. May 23, 2008) (discussing changes).

This change has caused some courts, including this one, to implement a procedure to alleviate the accrual of United States trustee fees by a reorganized debtor while making plan payments.   As described by one court:

> With the passage of BAPCPA, Congress added Code § 1141(d)(5), which postponed discharge of most individual chapter 11 debtors until after completion of all plan payments. *In re Mendez*, 464 B.R. 63, 64 (Bankr. D. Mass. 2011). This change meant that individual debtor chapter 11 cases with confirmed plans, like chapter 13 cases, would remain open until completion of plan payments and the granting of a discharge. *In re Johnson*, 402 B.R. 851, 853 (Bankr. N.D. Ind. 2009). Unlike chapter 13 plans, however, which, pursuant to Code § 1322(d)(1)(C), can never exceed five years, there is no statutory limit on the length of chapter 11 plans. *Id.* Post-BAPCPA, individual chapter 11 debtors faced the prospect of paying USTP fees for years on end, adding significantly to the administrative cost of chapter 11 relief. *See id.* at 855. A seven-year plan, for example, would saddle an individual debtor with quarterly fees, at a minimum, of $9,100. Even a five-year plan such as the Garcias' would run up a healthy fee.

> To remedy what appeared to be an unintended consequence of the BAPCPA amendment, this and a number of courts around the country fashioned procedures to enable individual debtors to close their cases once their plans were substantially consummated and their cases fully administered, typically shortly after confirmation, with the right to seek to reopen them in order to obtain a discharge upon completion of plan payments.

*In re Garcia*, No. 12-41403-MSH, 2018 WL 3524581, at *1-2 (Bankr. D. Mass. July 20, 2018) (citing, among others, E.D. Tenn. LBR 3022-1).

The second significant difference between the debtors' cited cases and their case is that unlike the debtors here, the debtors in those cases could not modify their confirmed plan after substantial consummation of its terms. Consequently, absent the ability to file a new case with a new plan, those debtors were out of luck when faced with an unforeseeable or unanticipated change in circumstances after substantial consummation. Since the passage of BAPCPA, however, individual chapter 11 debtors like their chapter 13 counterparts may modify a confirmed plan in

certain respects regardless of whether substantial consummation has occurred.   Under the new

chapter 11 provision:

> If the debtor is an individual, the plan may be modified at any time after
> confirmation of the plan but before the completion of payments under the plan,
> whether or not the plan has been substantially consummated, upon request of the
> debtor, the trustee, the United States trustee, or the holder of an allowed unsecured
> claim, to—
>> (1)   increase or reduce the amount of payments on claims of a particular
>>        class provided for by the plan;
>> (2)   extend or reduce the time period for such payments; or
>> (3)   alter the amount of the distribution to a creditor whose claim is
>>        provided for by the plan to the extent necessary to take account of any
>>        payment of such claim made other than under the plan.

11 U.S.C. § 1127(e).

Because of these two distinctions, a number of courts have concluded that an individual

debtor with a pending bankruptcy case in which no discharge has been granted is precluded from

filing a second case.   The leading case appears to be *In re McMahan*, 481 B.R. 901 (Bankr. S.D.

Tex. 2012), a case substantially similar to the case at hand except that the debtor's second case

was a chapter 13 rather than a second chapter 11.   There the court concluded:

> [U]ntil the debtor receives a discharge in his Chapter 11 case, he is barred from
> filing a second bankruptcy petition and proposing a new plan even if his Chapter
> 11 Case has been closed following confirmation of the plan.   Two simultaneous
> reorganization cases in which no discharge has been granted constitutes an abuse
> and manipulation of the Code.   Thus, the fact that the Debtor has not yet received
> his discharge in the Chapter 11 Case requires dismissal of the Pending Chapter 13
> Case.   This result is necessary, as an alternative rule would leave creditors
> vulnerable to adjudication of the same debt under two concurrent cases and plans.

*Id*. at 905.

The *McMahan* court observed that the debtor there had admitted that "he was in default to

the Bank under the Chapter 11 Plan, and that he had filed the Pending Chapter 13 case to stop the

Bank from going forward with its scheduled foreclosure sale—a right which the Bank had

bargained for in the Chapter 11 Case, and which was expressly set forth in the Chapter 11 Plan."

*Id*.   Rejecting the debtor's contention that he had filed his second petition in good faith, the court

countered that the debtor could have invoked § 1127(e) to modify his chapter 11 plan rather than

14

file a new case and propose a new plan. "In doing so, the Debtor has attempted to circumvent the procedures put in place by BAPCPA for modifying confirmed Chapter 11 plans of individuals." *Id.*

*McMahan* recognized that its conclusion was supported by the Supreme Court's holding in *Freshman v. Atkins*, 269 U.S. 121 (1925). In *Atkins*, the bankruptcy referee in the debtor's first bankruptcy case had recommended that the debtor's discharge be denied, but the court had failed to act on the recommendation. Subsequently, the debtor filed a second bankruptcy petition. Taking judicial notice of the pendency of the first bankruptcy case, the court denied the debtor a discharge as to the creditors who had also been involved in the first case, concluding, as restated by the Supreme Court, that "the pendency of the first application precluded a consideration of the second in respect of the same debts." *Id.* at 122. The Court stated that it concurred in this conclusion and explained:

> A proceeding in bankruptcy has the characteristics of a suit and since the denial of a discharge, or failure to apply for it, in a former proceeding, is available as a bar, by analogy the pendency of a prior application for discharge is available in abatement as in the nature of a prior suit pending, in accordance with the general rule that the law will not tolerate two suits at the same time for the same cause.

*Id.* at 123. Addressing the issue of whether the lower court could raise the issue of the prior suit pending, sua sponte, the Court found no fault, noting that the issue of the debtor's discharge was already pending. *Id.* To ignore the earlier proceeding and to proceed under the second "was an imposition upon and an abuse of the process of the court." *Id.* at 124.

Other courts have agreed. In *Hayes v. Prod. Credit Ass'n of the Midlands*, No. 87-2171, 1992 WL 26785 (10th Cir. Feb. 10, 1992), the court of appeals affirmed the bankruptcy court's sua sponte dismissal of the individual debtors' second chapter 11, filed to stop a secured creditor from proceeding against its collateral after the debtors had defaulted under the terms of the confirmed plan in their chapter 11 case. As stated by the court, "[w]e feel that to protect the integrity and administration of the bankruptcy proceedings, debtors should not be permitted to simultaneously maintain two proceedings involving the same debts. To allow such a situation would encourage debtors to abuse the protections afforded by the bankruptcy law." *Id.* at *3.

15

Under slightly different facts, our own Sixth Circuit Court of Appeals dismissed as moot the appeal of a dismissed chapter 11 case because the debtor had filed a chapter 7 case while the appeal was pending.  *See In re Gateway N. Estates, Inc.*, No. 94-1332, 1994 WL 610167 (6th Cir. Nov. 3, 1994).  Observing that the Supreme Court had held in *Atkins* that "the pendency of a petition in bankruptcy precluded the discharge of the same debts in a second petition," the court concluded that "there is no effective relief which this court may grant, because a reversal will result in two simultaneous petitions with respect to the same debtor and the same assets." *Id.* at *2-3; *see also In re Sidebottom*, 430 F.3d 893, 896-98 (7th Cir. 2005) (concluding that "there is general agreement that a debtor may not maintain two or more concurrent actions with respect to the same debts" and upholding the dismissal of a chapter 13 case filed while a chapter 7 case involving the same debts was pending); *In re Lawrence*, No. 92-2434, 1993 WL 360952, at *1 (7th Cir. Sept. 14, 1993) (stating that "a debtor may not maintain simultaneous petitions to discharge the same debts," the court upheld the dismissal of the debtor's second chapter 7 case); *In re Turner*, 207 B.R. 373 (B.A.P. 2d Cir. 1997) ("[T]here is universal agreement . . . that where a debtor files for chapter 7 relief and then files for protection under chapter 13 *before* receiving a discharge in the original chapter 7 case, that the chapter 13 case is a nullity . . . ."); *In re Sorenson*, 575 B.R. 527 (Bankr. D. Col. 2017) (dismissing a second chapter 13 case filed when the debtor still had 15 months of payments remaining under confirmed plan in pending chapter 13; after learned analysis of the issue, the court concluded that simultaneous reorganization cases, except for a very brief overlap, were untenable); *In re Brown*, 399 B.R. 162, 170 (Bankr. W.D. Va. 2009) ("A debtor is precluded from maintaining simultaneous bankruptcy proceedings with respect to the same debt. Mr. Brown had not received a discharge in his Confirmed Case prior to filing his second chapter 13 petition, and he scheduled his debt to Chase in both proceedings.   Mr. Brown's Second Case, in which Chase is the only scheduled creditor, should be therefore dismissed for violation of the principle set forth by the Supreme Court in *Atkins*."); *In re Brandford*, 386 B.R. 742 (Bankr. N.D. Ind. 2008) (construing *Atkins* and *Sidebottom* to preclude two simultaneous bankruptcy cases with the same debts, the court dismissed for cause the debtor's second chapter 13 filed while the first chapter 13 case was still pending without a discharge); *cf. In re Grimes*, 117 B.R. 531, 536 (B.A.P. 9th Cir. 1990) (holding that debtors who have been granted a discharge in a chapter 11 may file a subsequent petition under chapter 12 even though the first case remains open, as long as they meet

the requirements for filing the second petition); *In re Sanchez-Dobazo*, 343 B.R. 742, 747 (Bankr. S.D. Fla. 2006) (rejecting a per se rule barring a second filing before discharge in first case, where cases involved no overlapping debts or assets and the second chapter 13 case was filed one payment prior to completion of first chapter 13 plan and discharge); *In re Strohscher,* 278 B.R. 432, 436-37 (Bankr. N.D. Ohio 2002) (refusing to adopt a per se rule against a debtor maintaining more than one bankruptcy case, the court granted the debtors' motion to proceed with their chapter 13 case, even though their prior chapter 7 case, in which they had received a discharge, was still open for administrative purposes; court stated that it would apply the principle that "a debtor may only file a subsequent bankruptcy case after first receiving a discharge . . . , unless the debtor can demonstrate exceptional and unique circumstances which would necessitate the granting of extraordinary relief"); *In re Bullock*, 206 B.R. 389, 393 (Bankr. E.D. Va. 1997) ("*Atkins* does not preclude a debtor from maintaining two cases at the same time.   At most, *Atkins* could be interpreted as stating that two cases *which seek to discharge the same debt* cannot be pending simultaneously . . . ."); *In re Strause*, 97 B.R. 22, 29 (Bankr. S.D. Cal. 1989) ("[W]here debtors are entitled to entry of a discharge pursuant to Rule 4004(c), this Court will not require actual entry of a discharge [in a Chapter 7 case] prior to filing the subsequent Chapter 13 if the only reason for the delay is the court's administrative process.").

The only case arguably supporting the debtors' position of which this court is aware is *In re Lemus*, 516 B.R. 333 (Bankr. E.D. Va. 2014).   There, the individual debtor filed a chapter 13 case to stop a foreclosure after she defaulted under the terms of her confirmed plan in a prior chapter 11 case, which had been closed and a final decree entered after substantial consummation. The secured creditor moved to dismiss the chapter 13, arguing that it was an impermissible attempt to modify the chapter 11 plan, for which modification was precluded because the debtor's plan had been substantially consummated. The bankruptcy court correctly noted that because of BAPCPA, an individual debtor was not precluded from modifying a confirmed plan after substantial consummation. The court refused to characterize the second case as an attempted modification of the first, noting that it was a subsequent filing of an entirely new case and that nothing in the Bankruptcy Code prevents a debtor from having successive chapter 11 and 13 cases, although case law demands that the second case be filed in good faith.   *Id*. at 338.   In reaching

this conclusion, the *Lemus* court referenced *McMahan* and the issue therein of whether a debtor can file a new chapter 13 case before receiving a discharge in a prior chapter 11 case, but did not discuss the issue in the context of the case before it.   Rather, the *Lemus* court observed that *McMahan* had found that good faith was lacking because the debtor had essentially filed the second case with the sole purpose of frustrating the efforts of a creditor pursuing foreclosure. *Id.* at 339. In contrast, the debtor in *Lemus* was proceeding in good faith, the court said, because she had experienced a substantial and unanticipated change in her financial condition that enabled her to pay her creditors in her chapter 13, which she had been incapable of doing in her chapter 11 case. *Id.* at 340.

   *Lemus* is correct that the court in *McMahan* concluded that the debtor's second filing was not prosecuted in good faith under the facts of the case.   But this was an alternative holding to its legal conclusion that absent entry of a discharge order in the first case, a debtor cannot file a second case to discharge the same debt.   *See In re McMahan*, 481 B.R. at 914.   *Lemus* did not specifically address whether the debtor in the case before it had received her discharge in her chapter 11 case, but the implication was that she had not, because the court noted in a footnote that an individual debtor in a chapter 11 generally does not receive a discharge until all plan payments are completed. *See In re Lemus*, 516 B.R. at 338 n.7 (quoting 11 U.S.C. § 1141(d)(5)). Thus, the fact that *Lemus* allowed the debtor's second case to go forward does provide some support for the argument by the debtors here that their second case is not improper.

   Regardless, this court is persuaded by *Atkins* and its progeny, including *McMahan*, that an individual debtor in a pending reorganization case that has not received a discharge because plan payments have not been completed may not file a second bankruptcy case seeking to discharge the same debts.   The debtors in this case contend that these facts do not represent their situation, because their two cases are serial rather than simultaneous and because they have different assets and liabilities in their two cases.   They note that they have paid off the two claims of National Bank of Tennessee and no longer have the properties that were collateral for these debts.   The debtors also have additional unsecured debts now, namely to Becks Superior Hybrids, Inc., Warner Fertilizer Company, Inc., and certain health care providers, that they did not have in the first case.

18

The evidence in this case belies the debtors' contentions.   First, their two cases are in fact simultaneous, not merely serial.   The confirmed plan plainly provides that the debtors will "remain in Chapter 11 during the five-year term of the repayment to TSB subject only to any Order to 'administratively close' the case which Order shall not terminate the Chapter 11 proceeding." Further, the plan evidences the parties' intent that the estate would not be considered fully administered by the provision that the filing of an application for entry of a final decree must await until "completion of the first five years on or after January 31, 2021."   Unlike a corporate debtor requesting entry of a final decree, administrative closure of an individual chapter 11 case under our local rule is not dependent upon the estate being fully administered.   *Compare* Fed. R. Bankr. P. 3022 ("After an estate is fully administered in a chapter 11 reorganization case, the court, on its own motion or on motion of a party in interest, shall enter a final decree closing the case.") *with* E.D. Tenn. LBR 3022-1 ("In a chapter 11 case in which the debtor is an individual and obtains confirmation of a plan, the debtor may move for an administrative closure of the case without entry of a final decree upon the final disposition of all contested matters and adversary proceeding, including appeals.").

The motion that the debtors filed seeking to administratively close their case did not constitute a request for entry of a final decree.   To the contrary, the motion stated that once all plan payments were made the debtors would seek to reopen the case to obtain a discharge and for the entry of a final decree, an implicit recognition that the case remained pending under the Federal Rules of Bankruptcy Procedure notwithstanding its administrative closure.   Consistent with the limited relief requested in the motion, the court's order granting the motion contained no final decree language.   *Cf. In re McMahan*, 481 B.R. at 912 (order closing chapter 11 after plan confirmation was a "conditional decree" stating that case was closed "subject to being reopened to provide the debtor with a discharge").   And to the extent that there was any doubt as to the confirmed plan's continued effect, the order expressly stated that "[a]s set forth in 11 U.S.C. § 1141(a), the provisions of the Confirmed Plan and Confirmation Order shall continue to bind the Debtors, the creditors, and other parties in interest."

Second, the debtors' contention that they now have different assets and liabilities in their new chapter 11 case is not truly accurate.   The only difference in their significant assets, their real

19

properties, is that they have three fewer parcels than in the first case because they liquidated National Bank of Tennessee's collateral to pay off the creditor postconfirmation.   Otherwise their asset picture in this regard is substantially the same, since the eleven real properties listed by the debtors in their current schedules were also listed in their prior schedules.   As for liabilities, yes, the debtors do have some new unsecured debts, namely for seed, fertilizer, and approximately $6,300 in medical bills. But with the primary exception of National Bank of Tennessee, the majority of the approximately $4.5 million in debt that the debtors had at the time of confirmation in their first case remains unpaid, as their current summary of schedules list total liabilities of $3.3 million, which include new debts totaling less than $300,000.   The debtors' two largest secured creditors, TSB and Farm Service Agency, are still owed in excess of $2 million and $600,000, respectively, and the majority of the property taxes that existed in the first case still remain unpaid, including Jefferson County property taxes from 2011-2014.   And most importantly, it is undisputed that the debtors' new case is designed not only to address the new debts, but also the "old" debts, and to further modify the treatment of those old debts, including preventing TSB's collection efforts that were expressly authorized under the confirmed plan.   Consequently, it is simply not true, as amply demonstrated by TSB's very objection to the second case, that the debtors' current case addresses different assets and liabilities.

*McMahan* well articulates why an individual chapter 11 debtor must pursue plan modification rather than refiling if he desires to alter the terms of a confirmed plan.   That court noted that under § 1127(e), even though the debtor's plan was substantially consummated, the individual debtor could have sought to modify the plan at any time until plan payments were completed.   *See In re McMahan*, 481 B.R. at 920.   Permitting the second case to proceed would allow the debtor "to manipulate and bypass the explicit procedures of § 1127(e) and (f)."   *Id.* at 921.

> [I]ndeed, for individual debtors in Chapter 11, the Code clearly outlines a process
> and procedure for modification of a Chapter 11 plan.   Under § 1127(f)(2), an
> individual debtor's Chapter 11 plan "as modified, shall become the plan only after
> there has been disclosure under § 1125 . . . notice and hearing, and such
> modification is approved." 11 U.S.C. § 1127(f)(2). Stated more directly,
> modification requires disclosure, notice, hearing and court approval. The Code
> therefore does not envision the filing of a [new case] to effect a modification of a
> confirmed Chapter 11 plan.   Such a procedure would be unnecessarily duplicative:

it would allow a debtor to essentially restructure the same liabilities that have already been restructured in the Chapter 11 plan. Thus, while the Code permits modification of an individual debtor's confirmed Chapter 11 plan, this modification should be obtained through the procedures afforded by the Code.

*Id.* at 920-21.

The *McMahan* reasoning is equally applicable to the case at hand. Any efforts by the debtors to change the terms of their confirmed plan must be addressed in the context of a motion to modify plan; filing a new chapter 11 case while their prior one is still pending without the entry of a discharge is not permissible. Counsel for the debtors acknowledged to the court that the debtors pursued a new case because it was unclear whether they could reimpose the automatic stay through a plan modification. Regardless of this uncertainty, plan modification is the route provided by the Bankruptcy Code.

IV.

Even if the debtors' current filing is a mere serial filing as they argue, the court finds that the debtors did not file their second case in good faith. As noted above, good faith is a "fact-specific and flexible determination" that requires consideration of the totality of the circumstances. *In re Lee*, 467 B.R. at 917. To support the debtors' contention that they filed their current case in good faith, they reference the eight factors of *In re Laguna Assocs. Ltd. P'ship*, 30 F.3d 734, 738 (6th Cir. 1994), which the Sixth Circuit noted were meaningful in evaluating an organizational debtor's good faith:

(1)   the debtor has one asset;
(2)   the pre-petition conduct of the debtor has been improper;
(3)   there are only a few unsecured creditors;
(4)   the debtor's property has been posted for foreclosure, and the debtor has been unsuccessful in defending against the foreclosure in state court;
(5)   the debtor and one creditor have proceeded to a standstill in state court litigation, and the debtor has lost or has been required to post a bond which it cannot afford;
(6)   the filing of the petition effectively allows the debtor to evade court orders;
(7)   the debtor has no ongoing business or employees; and
(8)   the lack of possibility of reorganization.

21

*Id.* at 738.    According to the debtors, the only *Laguna* factor present is that TSB's pending foreclosure proceedings necessitated the second bankruptcy, but they point out that the "[m]ere filing by a business or individual in order to avoid foreclosure is, in and of itself, neither atypical nor extraordinary."    *In re Webb Mtn, LLC*, No. 3:07-CV-437, 2008 WL 361402, at *4 (E.D. Tenn. Feb. 8, 2008).

The court disagrees that the pending foreclosure is the only *Laguna* factor present in this case.    To the contrary, Mr. Layman's conduct after confirmation in the first case and prior to the filing of the second was at times improper (the second *Laguna* factor) and appeared designed to unnecessarily antagonize TSB and its employee, Ms. Spurgeon.    Specifically, the confirmed plan as previously quoted expressly stated that "Debtors will cooperate with Tennessee State Bank in signing flood certifications, modifications to extend the terms of security documents and/or any other documents that require modification as a result of the Plan."    Despite this language, Mr. Layman was uncooperative with TSB's efforts to obtain the required signatures.    According to the April 7, 2016 letter from TSB's counsel to debtors' counsel, on March 18, 2016, TSB transmitted for execution the four deed of trust modifications and flood certificates.    Debtors' counsel requested some changes on March 24, and TSB emailed revised documents reflecting the changes on March 25.    Yet that same day in a visit to a TSB branch Mr. Layman refused to sign one of the flood certificates, saying that he was not familiar with the property, and did not sign any deed of trust modifications, although he did do so later.    Mr. Layman also informed TSB that his parents would not sign any deed of trust modifications, justifying their refusal at the hearing by their belief that TSB had broken certain unspecified promises and maintaining that the confirmed plan did not require his parents' signatures on modifications, only those of the debtors.    While Mr. Layman correctly reported the letter of the confirmed plan, since it only expressly stated that the debtors would cooperate in signing needed modifications, Mr. Layman's interpretation was certainly contrary to the plan's spirit and presumed intent of cooperation.

There was other evidence of improper conduct.    For example, on August 3, 2016, Ms. Spurgeon emailed the debtors asking about the status of their personal and business 2015 federal tax returns.    Receiving no response, she emailed the debtors again on August 8, to which Mr. Layman emailed a curt response that "I did not respond to your email as you are aware . . . late

taxes do not have to be filed until September." Ms. Spurgeon testified that whenever she or someone on behalf of TSB emailed the debtors regarding past-due payments, notice of insurance cancellations or overdue submission of financial statements, the debtors would respond back asking for a significant document production from TSB, such as copies of several years of appraisals, the amount of interest paid several years prior, or promissory note balances on certain dates, requests that would sometime necessitate hours to respond. Ms. Spurgeon added that if she did not respond quickly enough to the debtors' requests, they would email her question marks or exclamation points, or question why she was not responding.

The improper conduct of the debtors toward Ms. Spurgeon in particular culminated in the February 16, 2018 series of emails and telephone conversation between Mr. Layman and Ms. Spurgeon. As previously described, Mr. Layman emailed Ms. Spurgeon requesting that she meet with him that day at a branch other than her usual office. After politely refusing to do so and informing him that TSB would not reduce the indebtedness the debtors owed, Mr. Layman essentially threatened Ms. Spurgeon, telling her that they would have a "pleasant little conversation" when he ran into her in person. While Mr. Layman denied at the hearing that he intended the statement as a threat, he admitted that he was very mad when he made the statement and acknowledged that the comment could be construed as a threat. This court could not be more emphatic that threatening another individual in such a way was not only improper, but also inexcusable.

Also present in this case is the sixth *Laguna* factor, the debtors' filing of their second bankruptcy petition effectively allows them to evade a court order, the confirmation order in their first chapter 11. A judicial order confirming a bankruptcy plan represents "a binding determination of the rights and liabilities of the parties as ordained by the plan." *Penberthy v. Chickering*, No. 15 Civ. 7613 (PAE), 2017 WL 176312, at *5 (S.D.N.Y. Jan. 13, 2017) (quoting *Celli v. First Nat'l Bank of N. N.Y. (In re Layo)*, 460 F.3d 289, 293 (2d Cir. 2006)); *see also* 11 U.S.C. § 1141(a) ("the provisions of a confirmed plan bind the debtor . . . and any creditor"). Ms. Spurgeon testified that TSB agreed to the debtors' plan if, among other things, it contained a plan provision lifting the automatic stay postconfirmation to pursue defaults. With TSB's agreement, the debtors were able to avoid a contested confirmation hearing and move forward with their

23

reorganization.    The debtors' filing of a new bankruptcy case for the admitted purpose of staying TSB's foreclosure sale remedy nullified TBS's bargained-for agreement confirmed by court order.

Along the same line, the court notes that the debtors propose in their new plan to surrender certain property in satisfaction of the indebtedness, something they are barred by the Bankruptcy Code from doing in a modification of their confirmed plan.  "[S]ection 1127(e), like section 1329(a), 'only permits modification of the amount and timing of payments, not the total amount of the claim.'"  *In re Hanson*, 2018 WL 4674592, at *7 (Bankr. E.D. Tenn. Sept. 26, 2018) (quoting *In re Nolan*, 232 F.3d 528, 535 (6th Cir. 2000) (debtor cannot modify a plan under § 1329(a) by surrendering the collateral to a creditor and having the creditor sell the collateral and apply the proceeds toward the claim)).  Specifically, the new plan provides for surrender of two parcels of real property: their 10,000 square-foot residence, which sits on 20 acres, for a $900,000 reduction in indebtedness and the 57-acre River Island subdivision for a $750,000 reduction in indebtedness.  In their confirmed plan the debtors placed respective market values on these properties of $682,000 and $565,000 and liquidation values of $575,000 and $400,000.  No explanation was offered as to how the values of these properties have increased so substantially in three years, other than Mr. Layman's testimony that the debtors undervalued their home previously.  The court can only conclude that the debtors' intention to surrender property in a new plan is nothing less than an attempt to "manipulate and bypass the explicit procedures of § 1127(e) and (f)."  *In re McMahan*, 481 B.R. at 920.

The eighth *Laguna* factor is the lack of a possibility of reorganization.  While there was not sufficient evidence presented regarding the debtors' new proposed plan to conclude that they lack the "possibility" of reorganization, other than perhaps the inflated values placed on the properties to be surrendered, this court has serious doubts as to their ability to successfully reorganize.  In their first case, the debtors began defaulting on their obligations to TSB less than two months after their plan was confirmed, and their gross farm income while operating under the plan was significantly less than their projections.  The debtors' gross farm income for the years 2015 through 2017 was $545,723, $634,521, and $623,782, far less than the debtors' projections of $843,675, $944,000, and $994,000 for these years in their first case.  Then, the debtors planned to grow canola as a new crop, in addition to their usual corn, wheat, and hay, but Mr. Layman

testified that they could never get canola to germinate due to excessive rain.   Now, the debtors'
planned new crop is hemp, although Mr. Layman acknowledged that they have not yet obtained
the license to grow the plants, that they are still in the "exploratory phase as to what plants are best
suited for our environment, what plants will produce the oil that we're trying to target," and that
successfully marketing the final product remains an issue.   Mr. Layman also testified that the
debtors will be farming without crop insurance, as they are ineligible for such insurance for five
years as they had made claims on their crop insurance for two consecutive years.   With no
evidence other than Mr. Layman's testimony that their crops were doing well this year, the debtors
ambitiously project next year's gross farm income at $1,196,500, even though in their current
schedules as amended they list their gross farm income this year at slightly less than $50,000 per
month or $600,000 per year.   Despite Mr. Layman's optimism, the court is unable to conclude
from the evidence that the debtors' new projections are any more realistic than their old ones.

The remaining *Laguna* factors—the number of assets held by the debtors, their number of
creditors and employees, and whether the debtor and objecting creditor have proceeded to a
standstill in state court litigation—shed little light on the debtors' good faith.   *Laguna*'s limited
utility is not surprising, as it involved a limited partnership debtor organized on the eve of
bankruptcy for the sole purpose of holding a single asset to frustrate a single creditor's collection
efforts.   *See In re Laguna Assocs. Ltd. P'ship,* 30 F.3d at 736.   None of the *Laguna* factors
specifically address serial bankruptcy filings, where courts have found the following factors useful
to a good faith analysis:

1) The length of time between the two cases;
2) The foreseeability and substantiality of events which ultimately caused the
   subsequent filing;
3) Whether the new plan contemplates liquidation or reorganization;
4) The degree to which creditors consent to the filing of the subsequent
   reorganization; [and]
5) The extent to which an objecting creditor's rights were modified in the initial
   reorganization and its treatment in the subsequent case[.]

*Matter of Bouy, Hall & Howard and Assoc.,* 208 B.R. 737, 744 (Bankr. S.D. Ga. 1995); *see also
In re JCP Properties, Ltd.,* 540 B.R. 596, 611 (Bankr. S.D. Tex. 2015) (utilizing the *Bouy* factors).
The court in *Bouy* observed that if the second case is "so related in time or in substance to the

earlier case that it represents a collateral attack on the initial order of confirmation," then the filing will be found to have been made in bad faith.  *Matter of Bouy, Hall & Howard and Assoc.,* 208 B.R. at 744.

Turning to the first factor, the length of time between the two cases, there were three years between confirmation of their chapter 11 plan on February 26, 2016, and the filing of their second chapter 11 case on March 6, 2019, substantially short of the five-year repayment period for TSB's claims and the twenty-year repayment period for Farm Service Agency as provided in the debtors' confirmed plan.   Moreover, the last semi-annual payment received by TSB under the confirmed plan was its January 2018 payment, such that TSB essentially received only two years of payments, after receiving no payments during the two years the debtors were in their first chapter 11.   While the debtors did attempt during that third year to find alternative financing to pay off TSB, their poor plan performance caused Farm Service Agency to refuse to guaranty a new debt.   Although generally the court would conclude that a span of three years between two cases is not necessarily indicative of a lack of good faith, the numerous defaults by the debtors under the confirmed plan suggest otherwise.

The second *Bouy* factor is the foreseeability and substantiality of events that ultimately led to the second filing.   A genuine need for a new chapter 11 due to "an extraordinary, unforeseeable change of circumstances that substantially and directly impeded [a debtor's] continued performance under a confirmed plan" is indicative of good faith.   *In re Adams,* 218 B.R. 597, 602 (Bankr. D. Kan. 1998).   The debtors assert that this factor is present because of the barn fire that resulted in a $2 million loss.   Yet the evidence did not establish that the loss was either unforeseeable or that it substantially impaired the debtors' plan performance.   As to foreseeability, Mr. Layman testified that he had sustained two prior barn fires in 2005 and 2010. Further, the confirmed plan obligated the debtors to "maintain the required full coverage insurance on all improved real property and personal property collateral during the term of repayment."   Had they done so, the loss of the barn and equipment in the fire that respectively served as collateral for National Bank of Tennessee and Farm Service Agency would have been substantially minimized.   To state the obvious, a potential fire loss is one reason that there is an insurance industry, and in the debtors' case, a fire in a barn was certainly foreseeable since it previously

26

happened to them on two prior occasions.   Although Mr. Layman did testify that he had sought to ensure that his contractor had insurance, that his contractor had misled him, and that the debtors had not had the funds to procure their own insurance for the barn and its contents, none of these facts are unforeseeable or even extraordinary.   *See In re Caviata Attached Homes, LLC*, 481 B.R. 34, 47 (B.A.P. 9th Cir. 2012) ("Cases in which a chapter 11 debtor has been successful at showing unforeseen changed circumstances to warrant a second chapter 11 filing are clearly the exception rather than the rule.").

Nor did the evidence establish that the fire loss substantially impaired the debtors' performance under the plan.   *See id*. at 46-47 ("Even extraordinary and unforeseeable changes will not support a new Chapter 11, if these changes did not substantially impair the debtor's performance under the confirmed plan." (quoting *In re Adams*, 218 B.R. at 602)).   Even prior to the fire, the debtors had numerous plan defaults, both as to failures to maintain insurance and timely make payments.   Although those earlier defaults were cured, the debtors' subsequent default that led to TSB seeking foreclosure appears to be more causally related to a failure to meet the plan's income projections rather than the fire.   Mr. Layman testified that the 200 acres planted after the fire with repurchased seed produced poorly, with income from that crop $80,000 less than it should have been.   Yet, total farm income in 2017 was only $11,000 less than it had been in 2016.   In fact, as previously noted, the debtors' gross farm income from 2015 through 2017 was significantly less than what they had projected in their plan for these years.   No explanation was given for these substantial shortfalls, or how the debtors would have been able to continue to make the plan payments despite these deficiencies.

The third *Buoy* factor is whether the new plan in the new case contemplates liquidation or reorganization.   "If the reorganized debtor proposes to liquidate in the later case, dismissal is not always indicated . . . ."   *In re Woods*, No. 10-12397, 2011 WL 841270, at *4 (Bankr. D. Kan. Mar. 7, 2011).   For example, the Seventh Circuit Court of Appeals in *Jartran* found that the debtor acted in good faith when the second filing was "not an attempt to modify the terms of the plan, but rather [was] a good faith admission that Jartran was unable to continue operating as a going concern."   *In re Jartran, Inc*., 886 F.2d 859, 868 (7th Cir. 1989).   Here, the debtors are not seeking to liquidate, but once again reorganize, asserting that but for the fire loss they would have

been successful at their first attempt.    As the fire loss was both foreseeable and unavoidable had the debtors simply purchased the insurance as required under their confirmed plan, to seek a second reorganization under these circumstances suggests a lack of good faith.

The fourth *Buoy* factor is the degree to which creditors consent to the new filing.    Although somewhat difficult to determine, since the debtors' second case is being considered in the context of TSB's motion to dismiss rather than plan confirmation, the court notes that Farm Service Agency supports TSB's motion and asks the court to dismiss the current case, such that the debtors' latest reorganization efforts are opposed by their two largest secured creditors.    Farm Service Agency's lack of support is particularly telling because the debtors' disclosure statement in the current case projects that Farm Service Agency would likely take a substantial loss on its claims in a liquidation, in contrast to the debtors' proposed plan which proposes to pay Farm Service Agency's two claims that exceed $750,000 in full over twenty years.

The fifth factor considered by *Buoy* is the extent to which the objecting creditor's rights were modified in the initial reorganization and its proposed treatment in the second case.    Ms. Spurgeon testified that before the debtors' 2014 filing, Mr. Layman requested in 2013 that TBS waive thousands of dollars in fees and charges and that the debtors' payments be restructured to align with their crop seasons.    Although TSB granted the requests, waiving $60,000 or $70,000 in fees and charges and restructuring the debts under a forbearance agreement, the debtors filed bankruptcy less than a year later, resulting in TSB receiving no payments during the two years prior to confirmation and further modifications of their claims in the confirmed plan.    Then, after making only two years' worth of payments in a five-year plan, the debtors now seek to further reorganize, by again substantially changing the treatment for TSB from that in the confirmed plan. Not only do the debtors propose in their new plan to force TSB to accept certain property at inflated values for satisfaction of indebtedness, the plan further reduces the interest rate to be paid on TSB's claims by a point and further extends the repayment period on those claims from January 2021 to July 2024.    And notably absent from the new plan is a provision that expressly lifts the automatic stay postconfirmation to pursue defaults, a plan provision that TSB negotiated in the confirmed plan as previously discussed.

Considering the totality of all the circumstances in this case, the court is confident that TSB has demonstrated that the debtors have not filed this current case in good faith.  While undeniably the debtors do seek an opportunity to continue their farming operations and further reorganize, it was clear from Mr. Layman's testimony that he assumed little responsibility for the debtors' current financial condition, and that he attributed the second bankruptcy filing primarily to TSB's refusal to continue to work with him.  Mr. Layman repeatedly referenced the fact that TSB was oversecured, that after the final default TSB had begun to accrue late fees at the maximum permitted by law, that TSB had funded the letters of credit, thereby increasing the debtors' obligations to TSB, and that TSB had complained when payments and required documents were not timely forthcoming as required by the terms of their agreements and confirmed plan.  It was clear that Mr. Layman believed that he was entitled to further financial breaks from TSB.  By filing a second bankruptcy case to thwart TSB's right to foreclose upon default in the confirmed plan free from any bankruptcy stay, a right it had specifically procured from the debtors in exchange for allowing them to obtain confirmation of a plan, the debtors have abused the bankruptcy process and acted in bad faith.

Lastly, the court notes that under 11 U.S.C. § 1112(b)(2), even if cause to dismiss a chapter 11 has been established, the court may not dismiss the case if the court finds and specifically identifies unusual circumstances establishing that dismissing the case is not in the best interests of creditors and the estate.  "Although a finding of unusual circumstances is within the court's discretion, the word 'unusual' contemplates facts that are not common to chapter 11 cases generally."  *In re Triumph Christian Center, Inc.,* 493 B.R. 479, 496 (Bankr. S.D. Tex. 2013) (quoting 7 *Collier on Bankruptcy* ¶ 1112.05[2] (16th ed. 2013)).  After a party has established cause to dismiss a case, the burden is on the debtor to "satisfy the elements of the 'unusual circumstances' test set forth in 11 U.S.C. § 1112(b)(2)."  *Id.*

In this case, the debtors contend that it is not in the best interests of creditors and the estate to dismiss their case because they plan to pay their creditors in full and dismissal of the case will result in no creditors being paid in full other than TSB and Deere & Co., which has a lien on the debtors' John Deere 4930 Hicycle Sprayer.  Whether dismissal is in the creditors' best interest is certainly better answered by the creditors, none of whom has voiced an objection to the requested

29

dismissal.    To the contrary, Farm Service Agency, who stands to not being paid in full if there is a liquidation, supports the dismissal.    As for the estate's best interest, while Mr. Layman opined that the debtors' farming operations essentially would be wiped out if TSB were allowed to enforce its deeds of trust, he testified that only about ten percent of the farmland that the debtors farm constitutes TSB's collateral and that none of their farm equipment is TSB's collateral.    While the debtors do utilize income from their rental properties which are TSB's collateral to supplement their farming income, the court is unable to conclude that this fact, either alone or in context with the others, equates to "unusual circumstances" compelling the denial of TSB's motion.

V.

The foregoing constitutes the court's findings of fact and conclusions of law.    In summary, this chapter 11 case, the debtors' second, must be dismissed because the debtors' first chapter 11 case is still pending and the debtors have not yet received a discharge in that case.    In addition, the debtors have filed this second case in bad faith and there are no unusual circumstances that support allowing the case to go forward.    Accordingly, an order dismissing this case will be entered.

# # #